In the United States District Court
for the Middle District of Pennsylvania

Carole Wise                          :

    Plaintiff                      : Case No. 3:14-CV-2303

    v.                             :

Carolyn W. Colvin                    : (Judge Richard P. Conaboy)
Commissioner of Social Security
                                   :

    Defendant.                     :

                                   :

_____

**Memorandum**

## I.  Background.

    We consider here Plaintiff's appeal of a denial of Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  The administrative law judge ("ALJ") who evaluated this claim found that the Plaintiff has the residual functional capacity ("RFC") to perform "sedentary work", as defined in 20 CFR 404.1567(a) and 416.967(a), with additional limitations such that she avoid climbing stairs or ladders; avoid operating motor vehicles; stoop, bend, kneel, crouch and crawl only occasionally; avoid loud noise levels; confine her work to unskilled tasks that can be learned on the job in a short period of time; and have no interaction with the general public and only occasional interaction with co-workers.   (Doc. 8-2 at 18-19).  The ALJ found also that jobs within the Plaintiff's stated limitations exist in significant numbers in the national and regional economy.  (Doc. 8-2 at 25-26).

1

Thus, the ALJ denied Plaintiff's claim and that denial was subsequently affirmed by the Appeals Council by letter dated October 10, 2014.  (Doc. 8-2 at 2).

Plaintiff's appeal, over which we exercised jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c), is based upon six assertions.  (See Doc. 10): (1) that the ALJ failed to comply with the Remand Order of the Appeals Council dated May 17, 2012; (2) that the ALJ erred by finding several of Plaintiff's impairments to be "non-severe"; (3) that the ALJ erred by finding that the Plaintiff does not meet the criteria of Listing 12.07; (4) that the Commissioner's conclusion that there is work available to the Plaintiff which she can perform is not supported by "substantial evidence"; (5) that the ALJ incorrectly evaluated the opinion evidence and (6) that the ALJ improperly evaluated the Plaintiff's credibility.  We shall consider these arguments in the context of all evidence of record.

**II.  Testimony Before the ALJ.**

    **a.    Testimony of December 8, 2010.**

Testimony was taken on December 8, 2010; October 11, 2012; January 28, 2013; and May 1, 2013.[1]  At the hearing of December 8, 2010, the Plaintiff testified that she was born on October 6, 1974

---

[1] Testimony was taken in piecemeal fashion because the Appeals Council remanded this matter to the ALJ for additional consideration and receipt of additional medical evidence.  See Doc. 8-3.

and had achieved her 36th birthday before the first hearing.  (Doc. 8-2 at 113).  She is married and her husband is out of work due to a knee surgery.  (Id. at 113-14).  They have a daughter age 16 and a son age 14 who reside with them in their home.  (Id. At 114).

Plaintiff alleges that she became disabled on October 20, 2008 when she experienced numbness and a tingling sensation along the right side of her body as she was descending some stairs.  (Id. at 114).  She stated that she went to the hospital and indicated that they (the doctors at the hospital) did not discover anything wrong at that time.  She stated that she weighed 376 pounds and stood 5'10'' tall at the time of the first hearing and that she weighed about the same at the time she experienced the aforementioned symptoms.  (Id.).  She stated that her family was subsisting on public assistance and food stamps since both she and her husband are out of work.  (Id.).

Plaintiff also testified that since the onset of her alleged disability she has not received Unemployment Compensation or Workers' Compensation.  She has a valid driver's licence and has completed her high school education and two years additional schooling to earn an A.A. degree in electronics.  (Id. at 116).  She later worked for a time in the electronics field but has not worked in any capacity since October 20, 2008.  (Id. at 117).

Plaintiff stated that she has had no psychiatric examinations, intensive outpatient therapy, or group therapy since her alleged

3

onset date.  (Id. at 118).  She related that she sees a physician once every three months to review her medications.  (Id. at 119-20).  She also stated "my mental health has been pretty good. Things have been getting easier to handle."  (Id. at 120).

With respect to her physical problems, Plaintiff stated that one physician thinks all her physical problems stem from her migraine headaches, while a second physician has told her that "there's actually something wrong with the muscles and something wrong neurologically with the [her] body."  (Id. at 121). Plaintiff also acknowledged that the physician who told her something was neurologically wrong with her had not reflected that opinion in his notes.  (Id.)

Plaintiff stated that she has difficulty sleeping but that a sleep study indicated that she did not require a CPAP device. (Id.).  She related that she takes a generic form of Ambien when she has not succeeded in falling asleep by 1:00 to 2:00 in the morning.  (Id. At 122).  She stated further that she believed she had suffered a stroke but that her doctors told her she had had a TIA.  (ID.).  She acknowledged that her medical records did not substantiate that she had suffered a TIA.  (Id.).  Plaintiff stated that she uses a walker because her legs frequently give out on her when she tries to walk.  (Id. at 123).  She also acknowledged that her doctors have not found the reason why her legs give out.  (Id.).  She stated that she had been at her current

4

weight (376 pounds) for a long time.  (Id.).

Describing a typical day, Plaintiff stated that she rises about 9:30 a.m. and her daughter helps her get dressed because she has trouble getting her pants up.  She cannot put her pants on without assistance because she gets dizzy when she bends forward. Her daughter also helps her make breakfast because if she stands too long her legs will give out.  After breakfast she generally sits on the front porch to get some sunshine.  In the summer of 2009, she would go to physical therapy on weekdays at 11:00 a.m. and would return home at approximately 1:00 p.m. whereupon she would nap and watch television until suppertime.  She would not participate in preparing supper, a task that would be performed by her husband or her children.  Afterward, if the weather was good, she would sit out on the porch, and, if the weather was bad, she would watch television until going to bed between 9:00 and 10:00 p.m.  (Id. at 123-26).

Plaintiff testified further that she has been unable to work since October 20, 2008 because she cannot stand for long periods of time and can walk only very short distances.  (Id. At 128).  She expressed disappointment that her doctors could not determine what was wrong with her.  (Id.).  She stated also that her doctors had not suggested any sort of treatment for her psychological problems. (Id.).

On questioning from her attorney, Plaintiff stated that she

uses a wheel chair on bad days- -typically three or four days each week. She has had a wheelchair since a hospitalization in 2008. She uses the wheelchair at home and when she goes elsewhere. She stated further that she uses a walker to get from the wheelchair to the bathroom on her bad days. (Id. at 129-31). Plaintiff testified that she could read for no more than 30 minutes at a time before her vision blurs. As of December, 2010 this blurred vision had been present for about six months to one year. She wears a brace on her left hand because of a sensation of pins and needles that she had been experiencing for the last three months. She stays on the first floor of her home because she can manage no more than the four steps to get from the sidewalk to the first floor of her home. She has been advised not to drive until her doctors arrive at a definitive diagnosis of her conditions. Her husband transports her in a wheelchair accessible vehicle. She cannot sit for more than 45 minutes before she has to recline and stretch to relieve her back pain. She has been experiencing problems with her memory and continues to experience migraine headaches about once each week. These headaches typically last five to six hours and do not respond to medication. Symptoms associated with her migraine headaches include dizziness, nausea, and photosensitivity. (Id. At 132-138). Plaintiff's testimony concluded with her assertion that she has had no sensation in her right leg below the knee since October of 2008 and no sensation in her left leg since March of

2009.  (Id. at 140-42).

      **b.    Vocational Expert's Testimony of December 8, 2010.**

     Ryan Bierely, a vocational expert, also testified.  Mr. Bierely stated that the Plaintiff would be characterized under the Social Security regulations as a younger individual with a high school education or more.  Plaintiff's past relevant work included work as a wire harness assembler and a sales attendant.  The former occupation is semi-skilled light work while the latter is unskilled light work.  Based upon a hypothetical question that assumes a person the same age, educational level and work experience as the Plaintiff with the capacity for light work but for additional limitations as to climbing, pulling, bending, kneeling, crouching, reaching overhead, noise intensity levels, working around moving machinery, and avoidance of high places, the vocational expert concluded that Plaintiff could no longer perform her past relevant work as a sales attendant but could perform her previous job as a wire harness assembler.  If other limitations such as the inability to respond to usual pressures in a work setting and the need to use a walker in the work place were added to the hypothetical question, Mr. Bierely testified that no work would be available in the national economy that the Plaintiff could perform.  (Id. at 145-51).

      **c.    Plaintiff's Testimony of October 11, 2012.**

     At the hearing of October 11, 2012, Plaintiff amended her

onset date to June 9, 2009 due to her attorney's reevaluation of the medical evidence. Plaintiff also testified that her husband attempted suicide about one week prior to the hearing and that this event had had profound impact on her mental health. (Doc. 8-2 at 97-98). Plaintiff appeared at the hearing in a wheel chair and wearing leg braces. She stated that she was wearing the leg braces because she was experience bi-lateral dropfoot symptoms. Plaintiff also reiterated her earlier testimony regarding her inability to ambulate without a cane or walker. (Id. at 99-100).

Plaintiff indicated that she had been prescribed wrist splints for bilateral carpel tunnel syndrome. She stated that her carpel tunnel symptoms caused her to frequently drop things. She stated that her current weight was now 390 pounds- - a weight gain since her first hearing. She attributed the weight gain to a change in her medications. She stated that she exercises but that her exercise is limited to upper body movements and stretches. (Id. at 101-02).

Plaintiff testified further that she sees a mental health counselor each week and a psychiatrist once every three months. In the summer of 2012 she began experiencing fainting spells. Her doctor, a doctor Reif, ordered an MRI to assess the cause of these spells but the MRI did not provide an answer. Plaintiff also testified that Dr. Reif prescribed Medrol for her and that she had gotten some relief from her migraine headaches as a result. She

8

testified also to increased difficulty with her memory and that her overall condition had worsened since her first hearing.  Plaintiff did acknowledge that no doctor had determined the reason why she had experienced her fainting spells.  (Id. 102-06).

   **d.   Testimony of January 28, 2013.**

On January 28, 2013, Plaintiff testified that she continues to treat with Dr. Reif and her family physician, Dr. Del Tredici. Plaintiff stated that she had been placed on an increased dose of Abilify which had helped ease her depression.  She stated that she continues to experience migraine headaches at least once a week and that bright lights and fragrances can exacerbate these headaches. The headaches can last for 2-3 days.  Plaintiff also testified that she continues to wear wrist braces for her carpel tunnel syndrome and that she continues to experience difficulty holding objects at times.  At such times her hands become "tingly" for 2-3 minutes.

Plaintiff stated that she continues to see a counselor weekly and her psychiatrist every three months.  She continues to experience confusion and memory problems.  These memory problems include difficulty in remembering birthdays and anniversaries. Plaintiff indicated that a consultative report prepared by Dr. Bree indicated erroneously that she had not required assistance getting on and off his examination table.  The hearing concluded with the ALJ's pronouncement that she was going to direct an additional medical report to address both the physical and psychological

9

aspects of Plaintiff's problems.  (Id. at 82-88).

    **e.   Testimony of May 1, 2013.**

On May 1, 2013, Plaintiff provided updated testimony which closely tracked complaints she had described at her previous hearings.  She indicated that she continued to experience migraine headaches about once each week, that her weight had actually increased slightly despite the fact that she was following a low fat diet, and that she was performing exercise as recommended by her doctor.  (Id. at 56-58).

Testimony was also received from Andrew Kaparelli, a vocational expert.  When asked to respond to a hypothetical question that assumed a person of Plaintiff's age, education, and work experience with limitations as to climbing stairs or ladders (never), driving or operating large equipment (never), only occasionally stooping, bending at the waist, kneeling, crouching, squatting, crawling, or reaching overhead bilaterally, avoidance of loud noise levels, fast moving machinery, sharp objects and toxic chemicals, and work involving only simple duties with only occasional interaction with co-workers and no interaction with the general public, Mr. Kaparelli responded that, given these assumptions, Plaintiff would be unable to perform any of her past relevant work.  Mr. Kaparelli testified further that, given the RFC corresponding to the ALJ's hypothetical question, work did exist in the national and regional economy that Plaintiff could perform.

Such work included jobs such as final assembler, semi-conductor bonder, and table worker.  (Id. at 65-70).

Plaintiff's attorney asked Mr. Kaparelli whether a person described in the ALJ's hypothetical question would be able to perform any of the aforementioned jobs if that person also required rest periods for up to one third of the work day.  Mr. Kaparelli stated that such a person would not be adequately productive to sustain any full-time employment.  Mr. Kaparelli's answer remained the same on the additional assumptions that Plaintiff would miss up to four days of work per month or would be off-task more than 15% of the workday due to physical and mental impairments and the side effects of medications.  (Id. at 73-77). [2]

## III. Medical Evidence.

### a.    Physical Impairment Evidence.

Plaintiff was diagnosed with carpel tunnel syndrome as confirmed by EMG studies, chronic migraine headaches, peripheral neuropathy, chronic back pain, chronic knee pain, morbid obesity and hypertension by her family physician, Dr. Del Tredici, and her treating neurologist, Dr. Reif.  These diagnoses were based upon long-term physician/patient relationships (four plus years with Dr. Del Tredici and three plus years with Dr. Reif).  See Doc. 8-21,

---

[2] Testimony was also received from Dr. Dora Logue, a psychiatrist who provided a consultative report (Doc. 8-26) regarding Plaintiff after reviewing her medical records.  Dr. Logue's testimony and opinion will be discussed below.

Exhibit 42F; Doc. 8-22, Exhibit 41F).

Two consulting physicians, who each examined the Plaintiff on only one occasion, concurred with the various diagnoses of the treating physicians. Dr. Taswir, who examined Plaintiff in September of 2010, diagnosed hypertension, morbid obesity, and migraine headaches. Dr. Bree, who examined Plaintiff on November 1, 2012, diagnosed morbid obesity and carpel tunnel syndrome and seemingly concurred with the treating physicians' finding of neuropathy by stating his impression of "lower extremity weakness and decreased sensation in the lower extremities." See Doc. 8-22, Exhibit 46F; Doc. 8-18, Exhibit 23F).

A consulting, non-examining physician, Dr. Dora Logue, reviewed Plaintiff's medical records after this case was remanded to the ALJ by the Appeals Council. Dr. Logue opined that Plaintiff was affected by somatization disorders including right-sided hemiplegia with hemesthia, obesity, osteoarthritis of her knees, and migraine headaches. (Doc. 8-26 at 8). Dr. Logue also stated that Plaintiff "has had osteoarthritis and mild degenerative joint disease of the spine, likely caused and aggravated by the obesity." (Id.).

**b.   Psychological Impairment Evidence.**

Dr. Del Tredici, Plaintiff's family physician diagnosed her with anxiety and depression. (Doc. 8-22, Exhibits 44F at 2 and 48 F at 1). Dr. Reif, Plaintiff's treating neurologist, diagnosed her

with depression and somatization disorder.  (Doc. 8-21, Exhibit 42F at 1-2).  Dr. Taswir, an examining consultant, diagnosed Plaintiff with depression and adjustment disorder.  (Doc. 8-18, Exhibit 23F at 3-4)).  Dr. Logue the non-examining consultant, diagnosed her with personality disorder and somatization disorders NOS (Doc. 8-26, Exhibit 57F at 8).  Thus, there was general agreement among these physicians that Plaintiff suffers from depression and agreement by Drs. Reif and Logue that Plaintiff suffers from somatization disorder.[3]

**IV.  ALJ Decision.**

The ALJ determined that Plaintiff had not been under a disability since her alleged onset date and made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2.    The claimant has not engaged in substantial gainful activity since June 9, 2009 the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.    The claimant has the following severe impairments:

_____

[3] Somitization disorder, also known as somataform disorder or conversion disorder, is a long-term (chronic) disorder in which a person has physical symptoms that involve more than one part of the body, but no physical cause can be found.  The pain and other symptoms attendant to somatization disorder are real and not contrived.  See National Institute of Health website at www.nih.gov.

somatoform and conversion disorders, personality

disorder, dysthymic disorder, obesity and headaches.

(20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or

combination of impairments that meets or medically

equals the severity of one of the listed impairments

in 20 CFR Part 404, Subpart P, Appendix 1, 20 CFR

404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925

and 416.926).

5.   After careful consideration of the entire record,

the undersigned finds that the claimant has the

residual functional capacity to perform sedentary

work as defined in 20 CFR 404.1567(a) and 416.967(a)

except that she needs to avoid climbing stairs,

rope, ladders, scaffolds, and poles, needs to avoid

operating a motor vehicle and large equipment

machinery, can occasionally stoop, bend to the

waist, kneel, crouch, crawl and squat, can

occasionally reach bilaterally overhead, and due to

headaches, should avoid loud and very loud noise

intensity levels, which are compatible with the

noise level in a can manufacturing department and a

rock concert, front row.  The claimant needs to

avoid working around or with hazardous machinery, in

high exposed places, with large fast-moving
machinery on the ground, around or with sharp
objects, and around or with toxic or caustic
chemicals.  The claimant retains the mental capacity
for unskilled work that can be learned on the job in
a short period of time and requiring no interaction
with the general public and occasional interaction
with co-workers.

6.   The claimant is unable to perform any past relevant
work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on October 6, 1974 and was 34
years old, which is defined as a younger individual
age 18-44, on the alleged disability onset date.
(20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education
and is able to communicate in English.  (20 CFR
404.1564 and 416.964).

9.   Transferability of job skills is not material to the
determination of disability because using the
Medical Vocational Rules as a framework supports a
finding that the claimant is "not disabled," whether
or not the claimant has transferable job skills (See
SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix
2).

10.    Considering the claimant's age, education, work
       experience, and residual functional capacity, there
       are jobs that exist in significant numbers in the
       national economy that the claimant can perform (20
       CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as
       defined in the Social Security Act, from October 20,
       2008, through the date of this decision (20 CFR
       404.1520(g) and 416.920(g)).

**V.    The Disability Determination Process.**

The Commissioner is required to use a five-step analysis to
determine whether a claimant is disabled.[4]  It is necessary for the
Commissioner to ascertain: 1) whether the applicant is engaged in a
substantial activity; 2) whether the applicant is severely
impaired; 3) whether the impairment matches or is equal to the

---

[4]  "Disability" is defined as the "inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental impairment which can be expected to result
in death or which has lasted or can be expected to last for a continuous period of not less that 12
months . . . ." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

only if his physical or mental impairment or impairments are of such
severity that he is not only unable to do his previous work but cannot,
considering his age, education, and work experience, engage in any
other kind of substantial gainful work which exists in the national
economy, regardless of whether such work exists in the immediate area
in which he lives, or whether a specific job vacancy exists for him, or
whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (Doc. 8-2 at 26).

**VI. Standard of Review**

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence

17

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion. *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted). The search for

18

> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence

19

included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d
Cir. 2004). "[W]here [a reviewing court] can determine that there
is substantial evidence supporting the Commissioner's decision, . .
. the *Cotter* doctrine is not implicated." *Hernandez v.
Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir.
2004) (not precedential).

A reviewing court may not set aside the Commissioner's final
decision if it is supported by substantial evidence, even if the
court would have reached different factual conclusions. *Hartranft*,
181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d
1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings
of the Commissioner of Social Security as to any fact, if supported
by substantial evidence, shall be conclusive . . ."). "However,
even if the Secretary's factual findings are supported by
substantial evidence, [a court] may review whether the Secretary,
in making his findings, applied the correct legal standards to the
facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d
Cir. 1983) (internal quotation omitted). Where the ALJ's decision
is explained in sufficient detail to allow meaningful judicial
review and the decision is supported by substantial evidence, a
claimed error may be deemed harmless. *See, e.g., Albury v.
Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir.
2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d
112 (3d Cir. 2000) ("[O]ur primary concern has always been the

ability to conduct meaningful judicial review.").   An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

**VII. Discussion.**

   **A. General Considerations**

   At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits.   *See Dobrowolsky*, 606 F.2d at 406.   Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim.   *Id.*   "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act."   *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974).   As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence.   *Dobrowolsky*, 606 F.2d at 406.   Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be

21

strictly construed." *Id.*

**B.   Plaintiff's Allegations of Error.**

**1.   Whether the ALJ Erred by Failing to Comply with the Remand Order of the Appeals Council Dated May 17, 2012?**

Plaintiff contends that the ALJ erred by failing to comply with the remand order of the Appeals Council dated May 17, 2012. (Doc. 10 at 16).[5] Suffice it to say that this Court's review of the record discloses that the ALJ functionally complied with the remand order by taking additional testimony from a vocational expert and additional testimony regarding the severity of Plaintiff's mental impairments from a medical expert. Our review of the record persuades the Court that the ALJ complied technically with both directives.

Plaintiff argues that the ALJ did not properly evaluate the effect of her use of an ambulation device on her capacity for sedentary work. The hearing transcript demonstrates otherwise. The vocational expert clearly considered the effect of Plaintiff's use of a walker in concluding that she retained the RFC to perform such sedentary jobs as final assembler, bonder of semi-conductors, and table worker. (Doc. 8-2 at 70). The ALJ appropriately relied upon the VE's testimony in crafting her RFC, an RFC that was

---

[5] The Court must note that the Appeals Council apparently believed that the ALJ complied with its remand order of May 17, 2012 because it sanctioned her subsequent order denying benefits. (See Doc. 8-2 at 2).

confined to sedentary work with additional limitations that adequately accounted for Plaintiff's use of a walker.  Accordingly, Plaintiff's argument regarding the ALJ's supposed failure to comply with the terms of the remand order must be rejected.

2.   **Whether Substantive Evidence Supports the ALJ's Step 2 Evaluation?**

Plaintiff's argument regarding the ALJ's evaluation at Step 2 concerns the ALJ's finding that her carpel tunnel syndrome and lower extremity weakness were "non-severe" impairments.  The Court's review of the medical evidence persuades it that there was an ample evidentiary basis to conclude that Plaintiff's carpel tunnel syndrome is not a severe impairment.  No physician has described Plaintiff's carpel tunnel syndrome as severe.  In fact, both her treating physicians, Dr. Del Tredici and Dr. Reif, executed Physical Residual Functional Capacity Questionnaires in which they indicated that Plaintiff does not have significant limitations with respect to reaching, handling or fingering.  (Doc. 8-21, Exhibit 41F at 4; Doc. 8-21. Exhibit 42 at 4; and Doc. 8-22, Exhibit 44F at 4).  Thus, the Court finds that the ALJ's conclusion that Plaintiff's carpel tunnel syndrome was "non-severe" was supported by substantial evidence.

With respect to Plaintiff's argument regarding the severity of her lower extremity weakness, the Court finds that the medical evidence makes this a much closer call.  Nevertheless, because the

ALJ found that Plaintiff is beset by various severe impairments, even if Plaintiff's lower extremity weakness does, in fact, constitute an additional severe impairment, the failure to characterize it as such at Step 2 of the process constitutes no more than harmless error because Step 2 is a mere screening device that exists to "dispose of groundless claims."  Newell v. Commissioner of Social Security, 347 F.3d 541, 546 (3d. Cir. 2003). Because the ALJ continued her evaluation of Plaintiff's claim and moved on to the subsequent steps in the required evaluative process, and because the ALJ ultimately accounted for Plaintiff's lower extremity weakness in her hypothetical question to the vocational expert by confining Plaintiff to sedentary work with additional limitations, Plaintiff's claim of a defect at Step 2 must be rejected.  See also Rutherford v. Barnhart, 399 F.3d 546, 553 (3d. Cir. 2005) and Popp v. Astrue, 2009 WL 959966 (W.D. Pa. 2009).

    **3.**    **Whether the ALJ Erred by Finding the Plaintiff Does Not Meet Listing 12.07?**

Plaintiff argues that her somatoform disorders meet all criteria to satisfy Listing 12.07.  Listing 12.07 A Somatoform Disorders provides, inter alia, that there must be medical documentation of a "persistent non-organic disturbance" of the "use of a limb", or "movement and its control (e.g. coordination disturbance, psychogenic seizures, akinesia, dyskinesia" or

24

"unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury".  The record demonstrates that Plaintiff has been affected by each of these symptoms.  Yet, to be entitled to benefits under Listing 12.07, Subsection B thereof must also be satisfied.  Subsection B provides that the symptoms identified in the Subsection A criteria must result "in at least two of the following: (1) Marked restriction of activities daily living; (2) Marked difficulties in maintaining social functioning; (3) Marked difficulties in maintaining concentration, persistence, or pace; or (4) Repeated episodes of decompensation each of extended duration." There is no evidence in the record that criteria #4 regarding decompensation episodes has been satisfied.

Three physicians, Dr. Del Tredici, Reif, and Logue, concur that Plaintiff suffers from somatoform disorder.  They disagree, however, on the extent to which Plaintiff's somatoform disorder reduces her capacity to work.  While Dr. Logue, the non-examining consultant, found that Plaintiff has persistent non-organic disturbance of her use of her limbs, movement, sensation, and unrealistic interpretations of physical signs or symptoms associated with the preoccupation or belief that she had a serious disease or injury (Doc. 8-26 at 87), she found, nonetheless, that Plaintiff had no "marked" degree of limitation with respect to the criteria of Listing 12.07B.  (Doc. 8-26 at 92).  The treating

physicians, Drs. Del Tredici and Reif, did conclude that Plaintiff would have a "marked" inability to maintain concentration, persistence and pace (Doc. 8-22 at 41; Doc. 8-21 at 55).  The Court has not been directed, however, to any medical opinion indicating that Plaintiff has a "marked" inability to maintain social functioning or to perform the activities of daily living.  For that reason, the Court finds that Plaintiff has not met her burden to demonstrate "marked" restrictions in the requisite two criteria under Listing 12.07B.

**4.     Whether the ALJ Improperly Concluded That There is Work Available in the National Economy That Plaintiff Can Perform?**

Plaintiff argues that the ALJ's assessment of her RFC was so defective as to render invalid her conclusion that work exists in the national economy that Plaintiff can perform.  (Doc. 10 at 25-30).  Part of Plaintiff's argument involves the assertion that the ALJ inappropriately relied upon the VE's testimony that an individual who requires the use of a quad cane to walk can perform a sedentary job.  It is true that the Social Security Administrations' definition of sedentary work (See 20 CFR 404.1567(a)) contemplates some degree of standing and walking.  Nonetheless, the VE testified that his experience regarding jobs that he opined Plaintiff could perform (final assembler, bonder of semi-conductors, and table worker) persuaded him that the use of a

quad cane would not erode the occupational base for those jobs (Doc. 8-2 at 70).  This testimony provided a sufficient evidentiary basis for the ALJ to conclude that Plaintiff's use of a quad cane did not prevent her from performing these jobs.

Plaintiff's argument is also based on the assertion that, because sedentary work generally requires the ability to lift up to ten pounds (See 20 CFR 404.1567(a)), the ALJ incorrectly relied upon the VE's determination that the aforementioned jobs were within Plaintiff's physical capacity.  The Court notes that the VE's previously referenced testimony regarding his familiarity with the physical requirements of the positions in question does provide a reasonable basis for the ALJ's conclusion.  Beyond that, Dr. Del Tredici opined that Plaintiff could occasionally lift up to ten pounds and rarely could lift that weight: (Doc. 8-22 at 42).  Plaintiff's argument regarding her lifting limitations does not require our rejection of the ALJ's decision on this point.

Still another aspect of Plaintiff's argument involves her assertion that her carpel tunnel syndrome deprives her of the requisite manual dexterity to perform the jobs identified by the VE.  While it is true that these jobs do require, as Defendant acknowledges (Doc. 13 at 39), frequent handling and fingering, both Plaintiff's treating physicians have indicated the Plaintiff has no significant limitations in this regard.  (Doc. 8-21 at 57; Doc. 8-22 at 43).  Thus, there was an adequate evidentiary basis for the

ALJ to find that Plaintiff's carpel tunnel syndrome did not prevent her from performing the jobs identified by the VE.

Finally, the Plaintiff argues that the ALJ's hypothetical question to the VE failed to adequately account for her difficulties with concentration, persistence and pace.  The only component of the ALJ's hypothetical question that addressed these mental impairments provided: "The claimant retains the mental capacity for unskilled work that can be learned on the job in a short period of time and requiring no interaction with the general public and occasional interaction with co-workers."  (Doc. 8-2 at 20).  Dr. Del Tredici and Dr. Reif, Plaintiff's treating physicians, both indicated on functional capacity questionnaires that Plaintiff's conditions would "frequently interfere with [her] attention and concentration needed to perform even simple work tasks."  (Doc. 8-21 at 55; Doc. 8-22 at 41). [6]  Dr. Logue, the non-examining consulting physician, acknowledged that Plaintiff had "moderate difficulty" in maintaining concentration, persistence, and pace due to her Somatoform Disorder.  (Doc. 8-26 at 92).  The ALJ relied upon Dr. Logue's assessment of Plaintiff's limitations, as to her concentration, persistence, and pace in crafting her hypothetical question to the VE and, ultimately, her RFC determination.

---

[6] "Frequently" in the context of the questionnaires completed by Drs. Del Tredici and Reif means "34% to 66% of an 8-hour working day."  Thus, their assessments clearly indicate "marked" impairment in maintaining concentration, persistence, and pace.

The Court has severe misgivings about whether Dr. Logue's assessment constitutes the requisite substantial evidence (See Richardson v. Perales, supra) necessary to support the ALJ's determination of Plaintiff's RFC.  Dr. Logue, who has never laid eyes upon the Plaintiff, has somehow concluded that Plaintiff's Somatoform Disorder, which she and two treating physicians have all agreed exists, is not severe enough to be disabling.  Dr. Logue's explanation is that her evaluation of Dr. Tazwir's assessment of Plaintiff's limitations resulting from her Somatoform Disorder indicates that Dr. Tazwir's assessment, which found some "marked" impairments, were overly restrictive.  (Doc. 8-2 at 47).  However, Dr. Logue stated that she examined Plaintiff's situation solely from a psychiatric standpoint while taking into account the physical ramifications of the conversion disorder only. [7]  Thus, in assessing Plaintiff's limitations regarding concentration, persistence and pace, Dr. Logue failed to account for Plaintiff's migraine headaches- - which have been found by the ALJ to constitute a severe impairment and which, according to Plaintiff's consistent testimony at three hearings, occur at least once a week and can last up to six hours.  These migraine headaches are an impairment separate from and unrelated to Plaintiff's Somatoform Disorder.

---

[7] Conversion disorder is simply alternative nomenclature for Somatoform Disorder.  See note 3 ante.

Significantly, Dr. Logue's testimony does not directly address the severe impairments documented by the treating physicians, Drs. Del Tredici and Reif.  Dr. Logue does emphasize that some of Plaintiff's physical complaints of stroke-like symptoms and weakness and numbness in her lower extremities cannot be documented objectively through objective tests such as EEG studies or a Holter Monitor.  Yet, by definition, the hallmark of Somatoform Disorder is that the physical symptoms it produces cannot be objectively documented but are, nonetheless, real.  Thus, Dr. Logue's emphasis on a lack of objective findings to support some of Plaintiff's physical complaints seems irrelevant and inconsistent with her own acknowledgment that Plaintiff suffers from Somatoform Disorder. (Doc. 8-26 at 76).

The Court is certainly aware that, in an appropriate case, the ALJ is permitted to subordinate the findings of treating physicians to those of a non-examining medical consultant when the findings of the treating physicians are not well supported by clinical and laboratory diagnostic techniques or their opinions are inconsistent with other evidence in the case file.  See 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2).  However, having carefully reviewed this extensive file, the Court can find no obvious inconsistencies in the medical opinions proffered by the treating physicians and the lack of diagnostic test results to establish Plaintiff's physical symptoms logically flows, as indicated above,

from her diagnosis of Somatoform Disorder.  Dr. Logue's explanation of why her sense of Plaintiff's restrictions is less restrictive than that of Dr. Tazwir and the treating physicians is unpersuasive and lacking in detail.  It simply does not constitute that quantum of evidence that a reasonable mind might accept as adequate to support a conclusion as required by Richardson v. Perales and its progeny.  Consequently, this Court finds that the Plaintiff's RFC as determined by the ALJ was not supported by substantial evidence.

**5.    Whether the ALJ Appropriately Evaluated the Medical Opinion Evidence?**

As explained in the preceding section of the Memorandum, the Court has misgivings regarding the ALJ's decision to subordinate the opinion of two treating physicians to that of a non-examining consultant in the context presented by this case.  Perhaps prompted by the testimony of Dr. Logue discussed above, the ALJ "accorded little weight" to the opinions expressed by the treating neurologist, Dr. Reif.  (Doc. 8-2 at 25).  Dr. Reif's opinion is also assailed because it "appears overstated in comparison to his treatment notes, which repeatedly show that there is no objective reason for the claimant's complaints." (Id.).  Similarly, Dr. Del Tredici's assessment is "given little weight since it is not supported by the evidence of record including EKGs, Holter Monitor Studies, EEGs, MRIs, MRHs or MRAs.  The Plaintiff is also non-

compliant with treatment." [8]  Here again, the conclusion that Plaintiff's complaints of pain and other symptoms secondary to her Somatoform Disorder are less severe than she alleges because they are unsupported by objective testing is illogical.  The sine qua non for a diagnosis of Somatoform Disorder is that there will be no objective findings to support the patient's complaints.  Thus, the reasons advanced by the ALJ to justify her refusal to credit the opinions of the treating physicians in this case are utterly unpersuasive and the Court finds that the medical evidence here was improperly evaluated.

   **6.   Whether the ALJ's Findings Regarding Plaintiff's Credibility are Based Upon Substantial Evidence?**

   Plaintiff asserts that the ALJ's finding that she is only partially credible in describing her impairments is unsupported by the evidence.  The ALJ's opinion includes the now familiar recitation that "the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's...statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained

---

[8] The ALJ's statement that Plaintiff is "non-compliant with treatment" appears to be related to Dr. Logue's testimony that, on one occasion in October of 2009, Plaintiff's blood chemistry revealed that she had not taken the prescribed dosage of medicine designed to alleviate her migraine headaches.  (Doc. 8-2 at 10 and Doc. 8-26 at 73).  Given Plaintiff's lengthy treatment history for migraines dating back more than six years, her failure to take the requisite dosage of this medication on one occasion is hardly evidence of a history of non-compliance with her treatment regimen.

in this decision." (Doc. 8-2 at 21).

The ALJ relies, in part, on the already rejected notion that the Plaintiff's Somatoform Disorder is not as limiting as she alleges due to the absence of objective findings to support her physical symptoms. The ALJ also points to evidence of record, however, which does tend to support the conclusion that Plaintiff's limitations may not be quite as severe as her testimony would indicate. This other evidence includes: (1) a December 3, 2009 letter from Dr. Max Lowden of the Neurology Clinic at the Hershey Medical Center that indicates that Plaintiff told him that she was experiencing about one bad headache a month" (Doc. 8-14 at 30); (2) a September 20, 2012 letter from Dr. Reif to Dr. Del Tredici that notes that Plaintiff had five/five strength in her upper extremities on that date (Doc. 8-22 at 47); (3) a November 1, 2012 Disability Evaluation by Dr. Stanley Bree that reports that Plaintiff was able to get on and off the examination table without assistance (Doc. 8-22 at 54); and (4) Dr. Tazwir's Psychiatric Consultative Examination of September 27, 2010 that indicates that, despite the fact that Plaintiff has been under psychiatric care for more than two years, she has required no inpatient admissions or psychotherapy. (Doc. 8-18 at 23).

While these bits of evidence do not compel the conclusion that Plaintiff was exaggerating her impairments, they are enough to form a reasonable basis for the ALJ's conclusion that she was only

partially credible in this regard.  Consequently, we will not fault the ALJ's determination on this point.

**VIII.     Conclusion.**

For the reasons cited in the foregoing Memorandum, the Plaintiff's assignments of error are rejected but for her contentions that the ALJ's RFC assessment is unsupported by substantial evidence of record and that the ALJ improperly subordinated the medical opinions of her treating physicians to that of the non-examining consultant who failed to provide an adequate rational for disbelieving the conclusions reached by the treating physicians.  An Order consistent with these determinations will be filed contemporaneously herewith.


BY THE COURT


                              S/Richard P. Conaboy
                              Honorable Richard P. Conaboy
                              United States District Court

Dated: August 10, 2015

34